UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF | ) | 3: 26-MJ-84-JR |
| | ) | |
| THE EXTRADITION OF | ) | |
| | ) | GOVERNMENT'S DETENTION |
| AMAN, | ) | MEMORANDUM |
|   aka "Aman Aman," | ) | |
|   aka "Aman Ramesh" | ) | |

**MEMORANDUM OF EXTRADITION LAW AND
REQUEST FOR DETENTION PENDING EXTRADITION PROCEEDINGS**

The United States, in fulfilling its treaty obligations to the Government of Canada[1] and

acting at the request of Canada, respectfully requests that the fugitive in this case, AMAN, aka

"Aman Aman," aka "Aman Ramesh" (AMAN), be held without bond pending the hearing on the

certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*.  This memorandum

summarizes the framework of extradition law in the United States and sets forth the reasons why

AMAN should be detained.  In short, AMAN should be detained because he cannot overcome

the strong presumption against bail in international extradition cases.  Specifically, he cannot

meet his burden of showing that he is not a flight risk, that he is not a danger to the community,

and that special circumstances exist warranting his release.

**BACKGROUND**

---

[1] Treaty on Extradition Between the United States of America and Canada, U.S.-Can., Dec. 3, 1971, 27 U.S.T. 983, *as amended by* the Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 11, 1988, S. TREATY DOC. NO. 101-17 (1990), *and* the Second Protocol Amending the Extradition Treaty with Canada, U.S.-Can., Jan. 12, 2001, S. TREATY DOC. NO. 107-11 (2002) (collectively, the "Treaty").

Canada seeks the provisional arrest, with a view toward extradition, of AMAN so that he may stand trial for (1) second degree murder, in violation of Section 235(1) of the Canadian Criminal Code, and (2) attempted murder, in violation of Section 239(1)(b) of the Canadian Criminal Code.  A warrant for AMAN's arrest was issued on December 1, 2025, by Justice of the Peace S. Sohi in British Columbia, Canada.  The provisional arrest request presents the following facts, among others, as the basis for Canada's request.

The facts of this case are set forth in the Complaint filed herein and are incorporated herein by this reference.

Canada sought AMAN's provisional arrest, with a view toward extradition, pursuant to the Treaty.  The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in the U.S. District Court of the District of Columbia (filed in case number 1:26-mj-20) seeking a warrant for AMAN's provisional arrest with a view toward extradition.  The District of Columbia Court issued an arrest warrant, and AMAN was arrested on this extradition matter on March 31, 2026.  The proceeding was localized in to the District of Oregon with the filing of the complaint in this matter prior to AMAN's initial appearance in Oregon. AMAN is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I.      LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

The extradition process is *sui generis*, neither a criminal nor a civil proceeding. Accordingly, we have outlined the United States' extradition scheme below, and have detailed the court's circumscribed role in the extradition process.

### A.    The role of the extradition judge in extradition proceedings

Extradition is primarily an executive function with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge."  18 U.S.C. § 3184; *see also Zhenli Ye Gon v. Holt*, 774 F.3d 207, 210 (4th Cir. 2014); *Sidali v. I.N.S.*, 107 F.3d 191, 195 (3d Cir. 1997), *cert. denied*, 522 U.S. 1089 (1998).  The Secretary of State, and not the court, makes the decision regarding whether the fugitive should ultimately be surrendered to the requesting country.  18 U.S.C. §§ 3184, 3186; *Plaster v. United States*, 720 F.2d 340, 354 (4th Cir. 1983).  "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the court's role will be to consider the evidence presented on behalf of the requesting country and determine whether the legal requirements for certification—as defined in the treaty, statutes, and case law—have been established.  *Quinn v. Robinson*, 783 F.2d 776, 786 n.3 (9th Cir. 1986) (citing *Charlton v. Kelly*, 229 U.S. 447, 461 (1913)); *Cheung v. United States*, 213 F.3d 82, 88 (2d Cir. 2000).  If the court finds that the requirements for certification have been met, the court must provide the certification to the Secretary of State, together with a copy of any testimony taken before the court, and must commit the fugitive to the custody of the United States Marshal to await the Secretary's final determination regarding

3

surrender.  18 U.S.C. § 3184; *see Ordinola v. Hackman*, 478 F.3d 558, 609 (4th Cir. 2007)

(Traxler, J., concurring), *cert. denied*, 552 U.S. 947 (2007); *Cheung*, 213 F.3d at 88.

**B.      The requirements for certification**

At the extradition hearing, the court's review will be limited to determining whether: (1)

the judicial officer is authorized to conduct the extradition proceeding; (2) the court has

jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes

for which surrender is requested are covered by the applicable treaty; and (5) there is sufficient

evidence to support a finding of probable cause as to each offense for which extradition is

sought.  *In re Extradition of Exoo*, 522 F. Supp. 2d 766, 775 (S.D. W. Va. 2007); *see also Hoxha

v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006).  The following sections briefly discuss each finding

the court must make in order to issue the certification to the Secretary of State.

*i.      Authority of the court over the proceedings*

The extradition statute authorizes proceedings to be conducted by "any justice or judge of

the United States, or any magistrate judge authorized so to do by a court of the United States, or

any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  As such,

the judicial officer conducting the extradition hearing that Section 3184 prescribes does not

exercise "any part of the judicial power of the United States," but, rather, acts in a "non-

institutional capacity by virtue of a special authority."  *In re Extradition of Howard*, 996 F.2d

1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted).  Both magistrate

judges and district judges may render a certification under Section 3184.  *See In re Extradition of

Liuksila*, 74 F. Supp. 3d 4, 9 (D.D.C. 2014); *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir.

1999); *In re Extradition of Nezirovic*, No. CIV.A. 7:12MC39, 2013 WL 5202420, at *3 (W.D. Va. Sept. 16, 2013).

### ii.    Jurisdiction over the fugitive

The court has jurisdiction over a fugitive found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### iii.    Treaty in full force and effect

The extradition statute, 18 U.S.C. § 3184, provides for extradition in instances in which a treaty or convention is in force between the requesting state and the United States. *See Hoxha*, 465 F.3d at 562; *Zhenli Ge v. Holder*, 992 F. Supp. 2d 637, 644 (W.D. Va. 2014). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Canada. The court should defer to the Department of State's determination in that regard. *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997) ("[O]n the question whether [the extradition] treaty has ever been terminated, governmental action in respect to it must be regarded as of controlling importance" (quoting *Terlinden v. Ames*, 184 U.S. 270, 285 (1902)); *Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 184-85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight.").

### iv.    Crimes covered by the treaty

5

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty.  Article 1 of the U.S.-Canada Treaty provides for the return of fugitives who have been charged with, or convicted of, an offense covered by Article 2 of the Treaty that is committed within the territory of the requesting country.  Article 2 of the Treaty defines offenses as extraditable if the alleged conduct is punishable under the laws of both the United States and Canada by "imprisonment or other form of detention for a term exceeding one year or any greater punishment."

In assessing whether the crimes for which extradition is requested are covered by the Treaty, the court will examine the description of criminal conduct provided by Canada in support of its charges and decide whether that conduct would be criminal under U.S. federal law, the law of the state in which the hearing is held, or the law of a preponderance of the states.  *See Wright v. Henkel*, 190 U.S. 40, 61 (1903); *United States v. Sensi*, 879 F.2d 888, 893 (D.C. Cir. 1989); *Zhenli Ye Gon*, 774 F.3d at 210; *Hu Yau-Leung v. Soscia*, 649 F.2d 917, 918 & n.4 (2d Cir. 1981).  A requesting country need not establish that its crimes are identical to ours.  *Zhenli Ye Gon*, 774 F.3d at 217; *Sensi*, 879 F.2d at 893.  Indeed, "[t]he law does not require that the name by which the crime is described in the two countries shall be the same; nor that the scope of the liability shall be coextensive, or, in other respects, the same in the two countries.  It is enough if the particular act charged is criminal in both jurisdictions."  *Collins v. Loisel*, 259 U.S. 309, 312 (1922).

In fulfilling its function under Section 3184, the judicial officer should liberally construe the applicable extradition treaty in order to effectuate its purpose, namely, the surrender of fugitives to the requesting country.  *Factor v. Laubenheimer*, 290 U.S. 276, 301 (1933).

6

Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers[,]" *Grin v. Shine*, 187 U.S. 181, 184 (1902), the court should "approach challenges to extradition with a view toward finding the offense within the treaty," *McElvy v. Civiletti*, 523 F. Supp. 42, 48 (S.D. Fla. 1981); *see also Martinez v. United States*, 828 F.3d 451, 463 (6th Cir. 2016) ("The point of an extradition treaty after all is to facilitate extradition . . . ."); *United States v. Trabelsi*, 845 F.3d 1181, 1191 (D.C. Cir. 2017) ("Indeed, courts should be especially reluctant to read conditions into a treaty that would render extradition more difficult . . . .").

v.    *Probable cause that the fugitive has committed the offenses*

To certify the evidence to the Secretary, the Court must conclude that probable cause exists to believe that the person before it committed the crimes for which Canada seeks extradition.  Probable cause is established if there is "competent evidence to justify holding the accused to await trial."  *Ordinola*, 478 F.3d at 608 (internal quotation marks omitted) (citing *Hoxha*, 465 F.3d at 561); *see also Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) ("The standard for arrest is probable cause, defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the (suspect) had committed or was committing an offense.") (internal quotation marks and citation omitted); *Liuksila*, 74 F. Supp. 3d at 15.

The extradition judge's probable cause determination is "not a finding of fact in the sense that the court has weighed the evidence and resolved disputed factual issues," but instead "serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based."  *Quinn*, 783 F.2d at 791 (internal quotation marks and citation omitted).

7

### C.      The extradition hearing follows unique procedures

####       *i.      An extradition hearing is not a criminal proceeding*

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination belongs to the foreign court. Accordingly, an extradition hearing is not a criminal proceeding.  *Collins*, 259 U.S. at 316; *Neely v. Henkel*, 180 U.S. 109, 123 (1901).  The limited nature of the hearing has resulted in special procedural and evidentiary rules.

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings.[2]  *See Skaftouros v. United States*, 667 F.3d 144, 155 n.16 (2d Cir. 2011); *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008).  Moreover, the fugitive has no right to discovery.  *See Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991); *Jhirad v. Ferrandina*, 536 F.2d 478, 484 (2d Cir. 1976).  The fugitive's right to present evidence is severely constrained, *Shapiro v. Ferrandina*, 478 F.2d 894, 900-01 (2d Cir. 1973); and his constitutional rights are limited, *see Atuar v. United States*, 156 F. App'x 555, 562 (4th Cir. 2005) ("[extradition] proceedings are not designed to determine the guilt or innocence of the accused, and therefore, certain due process protections are simply not applicable.").  For example, the fugitive has no right to cross-examine witnesses who might testify at the hearing, *Skaftouros*, 667 F.3d at 155 n.16; there is no Sixth Amendment right to a speedy trial, *Jhirad*, 536 F.2d at 485 n.9; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993);

---

[2] Fed. R. Crim. P. 1(a)(5)(A) states: "Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."  Fed. R. Evid. 1101(d)(3) provides: "These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."

the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996) (citing *Collins*, 262 U.S. at 429); the exclusionary rule is not applicable, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and the fugitive does not have the right to confront his accusers, *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

> ii.   *Extradition hearings rely on written submissions and do not require live witnesses*

A certification of extradition may be, and typically is, based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Skaftouros*, 667 F.3d at 155 n.16. Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. *Yordi v. Nolte*, 215 U.S. 227, 231 (1909); *Shapiro*, 478 F.2d at 902. Requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham*, 241 U.S. at 517. Further, hearsay evidence is admissible at an extradition hearing and may fully support the court's findings leading to a certification under Section 3184. *Collins*, 259 U.S. at 317; *Hoxha*, 465 F.3d at 561.

> iii.   *The fugitive's evidence is very limited and excludes technical and affirmative defenses*

Due to the nature and limited purpose of an extradition hearing under Section 3184 and the importance of the international obligations of the United States under an extradition treaty, a fugitive's opportunity to challenge the evidence introduced against him is very circumscribed. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but may only introduce evidence explaining the submitted evidence. *See*

9

*Charlton*, 229 U.S. at 457-58; *Hoxha*, 465 at 561; *In re Extradition of Atuar*, 300 F. Supp. 2d 418, 427 (S.D. W. Va. 2003).  A contrary rule might compel the "demanding government to produce all its evidence . . . both directing and rebutting, in order to meet the defense thus gathered from every quarter."  *Collins*, 259 U.S. at 316 (quoting *In re Extradition of Wadge*, 15 F. 864, 866 (S.D.N.Y. 1883)).  The admission of such explanatory evidence is largely within the discretion of the court.  *In re Extradition of Sindona*, 450 F. Supp. 672, 685 (S.D.N.Y. 1978) (citing *Collins*, 259 U.S. at 315-17); *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991).

Courts routinely reject technical and affirmative defenses in extradition proceedings.  *See Bingham*, 241 U.S. at 517 (rejecting objections that "savor of technicality"); *Shapiro*, 478 F.2d at 901.  These issues, which require factual or credibility determinations, are for the courts in the requesting country to resolve at trial.

> iv.   *Rule of non-inquiry: the executive considers all matters other than sufficiency*

Other than the sufficiency of the evidence, all matters raised by the fugitive as defenses to extradition are to be considered by the Secretary of State, not by the court.  *See* 18 U.S.C. §§ 3184, 3186.  The Secretary takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country.  *See Mironescu v. Costner*, 480 F.3d 664, 666 (4th Cir. 2007); *Atuar*, 300 F. Supp. 2d at 426; *see also Jhirad*, 536 F.2d at 484-85 ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation.").  This is consistent with the long-held understanding that surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State" within the executive's "powers to conduct foreign affairs."  *See In re Kaine*, 55 U.S. 103, 110 (1852).  Similarly, a fugitive's contention that

the extradition request is politically motivated, or that the requesting state's justice system is unfair, should be addressed by the Secretary of State, not the court. *Koskotas*, 931 F.2d at 175 (motives of requesting state is a matter for consideration by the executive branch); *In re Extradition of Mackin*, 668 F.2d 122, 133 (2d Cir. 1981); *Sindona*, 450 F. Supp. at 693.

## II.     AMAN SHOULD BE DETAINED

### A.     Applicable law

#### i.     *A strong presumption against bail governs in an international extradition proceeding*

The federal statutes governing extradition in the United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply here because an extradition proceeding is not a criminal case. *See Collins*, 259 U.S. at 316; *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 597 (W.D. Va. 2013).[3]

Rather, unlike in domestic criminal cases, there is a "powerful presumption against bail" in international extradition cases. *United States v. Zarate*, 492 F. Supp. 2d 514, 515 (D. Md. 2007) (citing *Wright*, 190 U.S. 40); *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986); *see also In re Extradition of Ye Gon*, No. MISC. 08-596 (JMF), 2009 WL 3336092, at *1 (D.D.C. Oct. 15, 2009). "[B]ail should be granted only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *Leitner*, 784 F.2d at 160 (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).

---

[3] The Bail Reform Act applies only to "offenses" against the United States that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, the fugitive has not been charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather, with offenses committed against the requesting state, Canada.

11

This presumption against bail is rooted in *Wright v. Henkel*, where the Supreme Court explained that, when a foreign government makes a proper request under a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. at 62.

The prudential reasons for this presumption against bail in international extradition cases are clear and compelling. When, as here, the Government of Canada meets the conditions of the treaty, the United States is obliged to deliver the fugitive. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond. *See id.*; *see also Leitner*, 784 F.2d at 160-61 (the Government has an overriding foreign relations interest in complying with treaty obligations and producing extradited persons).

Further, while forfeiture of bail in domestic criminal cases is designed to compensate, at least in part, the court that is seeking the accused's presence for trial, forfeiture of bail in international extradition cases due to the failure of the fugitive to appear would leave Canada without either remedy or compensation.

   ii. *For the court to consider the question of bail, the fugitive must establish "special circumstances" and demonstrate that he is neither a flight risk nor a danger to the community*

12

In light of the strong presumption against bail established in *Wright*, a fugitive may not be released on bail unless he demonstrates that (1) he is neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant his release. *See, e.g.*, *Leitner*, 784 F.2d at 160; *Nezirovic*, 990 F. Supp. 2d at 600 ("Under the special circumstances standard, admission to bail should be an unusual and extraordinary thing, and courts should exercise the power sparingly.") (internal quotation marks and citations omitted). "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal proceedings by the Bail Reform Act." *In re Extradition of Kin-Hong*, 913 F. Supp. 50, 53 (D. Mass. 1996).

Moreover, the burden is on the fugitive to establish the existence of special circumstances.[4] *See, e.g.*, *Leitner*, 784 F.2d at 160; *In re Extradition of Drumm*, 150 F. Supp. 3d 92, 96 (D. Mass. 2015); *Ye Gon*, 2009 WL 3336092, at *4. Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *Leitner*, 784 F.2d at 160; *Nezirovic*, 990 F. Supp. 2d at 598; *see also Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 130 (E.D.N.Y. 2001) ("Absence of risk of flight is not a legally cognizable 'special circumstance' justifying release from bail.") (citing cases). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995). In

---

[4] The standard by which the fugitive must demonstrate "special circumstances" is unsettled. Some courts have required the fugitive to satisfy a preponderance of the evidence standard, *see Extradition of Santos*, 473 F. Supp. 2d 1030, 1036 n.4 (C.D. Cal. 2006), while others have required clear and convincing evidence, *see In re Extradition of Nacif–Borge*, 829 F. Supp. 1210, 1213-14 (D. Nev.1993); *In re Extradition of Mainero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996). Several courts have found it unnecessary to resolve the issue because of the difficulty in satisfying either standard. *See, e.g.*, *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *2 (C.D. Cal. March 7, 2016).

evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk). "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161.

In assessing whether a fugitive poses a danger to the community, courts have considered not only physical danger, but also economic danger. *See, e.g.*, *United States v. Reynolds*, 956 F.2d 192, 192 (9th Cir. 1992) (affirming denial of bail pending appeal, stating that "danger may, at least in some cases, encompass pecuniary or economic harm"); *United States v. Parr*, 399 F. Supp. 883, 888 (W.D. Tex. 1975) (stating that assessing danger to the community permits considering risk of pecuniary harm); *see also United States v. Jinwright*, No. 3:09-CR-00067-W, 2010 WL 2926084, at *3 (W.D.N.C. July 23, 2010) (stating, in case governed by Bail Reform Act, that "case law, which spans several decades, as well as several circuits, makes clear that economic danger provides an adequate basis for detention").

Where a fugitive claims special circumstances, "courts consistently agree that special circumstances are supposed to be limited to the most extraordinary circumstances and cannot involve factors applicable to all potential extraditees." *In re Extradition of Garcia*, 761 F. Supp. 2d 468, 472 (S.D. Tex. 2010); *In re Extradition of Lagadec*, 386 F. Supp. 3d 629, 629 (E.D.N.C. 2019) (stating that special circumstances must be "'extraordinary and not factors applicable to all [fugitives] facing extradition'") (quoting *Nezirovic*, 990 F. Supp. 2d at 599).

14

Courts have considered and rejected a lengthy list of would-be special circumstances –

among them:

- The complexity of the pending litigation, *see, e.g.*, *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996); *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271–72 (S.D.N.Y. 1987);

- The fugitive's need to consult with an attorney and/or participate in pending litigation, *see, e.g.*, *In re Extradition of Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992); *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- The fugitive's character, background, and/or ties to the community, *see, e.g.*, *Beresford-Redman*, 753 F. Supp. 2d at 1089; *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1300, 1305 (S.D. Fla. July 7, 2017); *In re Extradition of Saldana*, No. 09-MJ-00014-P, 2009 WL 2134377, at *3 (W.D. Tenn. July 10, 2009) (stating that a fugitive's character and background "are typically not considered special circumstances on their own, but are more often considered in regard to risk of flight and danger to the community, rather than as a special circumstance") (internal quotation marks, citations, and alterations omitted);

- That the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160–61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3–4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *Nezirovic*, 990 F. Supp. 2d at 602; *Lagadec*, 386 F. Supp. 3d at 630; *In re Extradition of Rouvier*, 839 F. Supp. 537, 541–42 (N.D. Ill. 1993); *In re Extradition of Huerta*, No. H–08–342M, 2008 WL 2557514, at *2 (S.D. Tex. June 23, 2008);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *In re Extradition of Antonowicz*, 17-cv-00861, 2017 WL 1197855, at *4 (C.D. Cal. Mar. 27, 2017); *In re Extradition of Knotek*, No. 13-9204 BRO, 2016 WL 4726537, at *7 (C.D. Cal. Sept. 8, 2016); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3–4 (allegedly well-respected businessman); *Borodin*, 136 F. Supp. 2d at 131; *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581–82 (W.D. Mich. 1991) (highly-trained doctor);

15

- The availability of electronic monitoring, *see, e.g.*, *Rovelli*, 977 F. Supp. at 569;

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989); *In re Extradition of Nagy*, No. 1:17MJ3283, 2017 WL 6558487, at *4 (N.D. Ohio Dec. 21, 2017) (stating that fugitive "cannot complain of the passage of time when he has been a part of the reason the time has passed"); *Antonowicz*, 2017 WL 1197855, at *3; *see also Lagadec*, 386 F. Supp. 3d at 630 (rejecting claim concerning France's delay); *Zhenli Ye Gon v. Holder*, 2013 WL 5726292, at *4 (W.D. Va. 2013) (rejecting petitioner's request for release where many of the delays were at the request of the petitioner); and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Antonowicz*, 2017 WL 1197855, at *3; *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 172 (S.D.N.Y. 2009); *Siegmund*, 887 F. Supp. at 1386–87.

While in certain exceptional cases, some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of factors, as opposed to any single consideration. Such findings are highly case-specific and within the discretion of the court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

### B.    Analysis

The Court should detain AMAN without bond because he is a danger to the community and a flight risk. *First*, the serious nature of the violent murder and attempted murder offenses with which AMAN is charged renders him a danger to the community both here in the United States and abroad if he were released from custody. *See*, *e.g.*, *In re Extradition of Perez-Cueva*, No. 16-0233M, 2016 WL 884877, at *3 (C.D. Cal. Mar. 7, 2016) (seriousness of allegations against fugitive "militates against release on bail"). This dangerousness renders bail inappropriate.

16

*Second*, AMAN is a flight risk. A fugitive charged with crimes in another country is already by definition in flight or deliberately absent from that jurisdiction. *See United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges. The intent is the same—the avoidance of prosecution.") (citing *Jhirad v. Ferrandina*, 536 F.2d 478, 483 (2d Cir. 1976)). Here, given the strength of Canada's case and the government's relatively low burden of proof in extradition hearings, AMAN has strong incentive to flee further, whether to a third country or to an underground location within the United States. *See, e.g.*, *In re Extradition of Adame*, 2013 WL 1222115, at *3 (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of proof, there is a significant risk that he will be formally extradited to Mexico"). Moreover, the prospect of serving a lengthy prison sentence in Canada—here, the charged offense of second degree murder carries a mandatory life sentence, and the charged offense of attempted murder carries a maximum sentence of life imprisonment—further incentivizes AMAN's flight. *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1305 (sixty-six years of age and potential twenty-one-year sentence "materially contribute[d] to [the fugitive's] high risk of flight"); *In re Extradition of Shaw*, No. 14-MC-81475-WM, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."). Indeed, AMAN has already shown incentive to flee by fleeing the scene of the crimes and then fleeing Canada to avoid prosecution; in fact, AMAN stated to his roommate,

H.K., shortly before the murder that he would not be returning to Surrey, British Columbia. Moreover, AMAN does not have lawful status in the United States and, indeed, Canadian authorities' investigation revealed that AMAN may have entered the United States at an illegal port of entry, indicating that he may have the means and connections to travel across borders undetected. In addition, in connection with their investigation, Canadian authorities have contacted multiple individuals associated with AMAN, and AMAN's alleged co-perpetrator, Gurtaj, has been arrested in Canada. As a result, Canadian authorities believe that AMAN may already be aware of the charges against him. The flight risk AMAN poses is, alone, fatal to any bail application.

These reasons alone warrant denying any forthcoming application for bail. However, even if the Court believed that AMAN is not a flight risk or danger to the community, the government is unaware of any "special circumstances" that would justify bail in this case. *Cf. In re Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of flight could be adequately mitigated). Allowing bail in any amount, under any conditions, would not reasonably ensure AMAN's presence in court and would invite the possibility of embarrassing the United States in conducting its foreign affairs.

Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to Canada, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated

release order so that the United States can consider the matter of whether, under the

circumstances, to seek a stay pending possible appeal on the bail issue.

### CONCLUSION

For the foregoing reasons, the United States requests that AMAN be detained pending

resolution of this extradition proceeding.

Dated: April, 1, 2026                          Respectfully submitted,


                                               SCOTT E. BRADFORD
                                               United States Attorney


                                               PAUL T. MALONEY, OSB#01336
                                               Assistant United States Attorney

19